UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JOSEPH P. CUVIELLO and
DENIZ BOLBOL, individually,

                               NO. CIV. S-07-1625 LKK/KJM

      Plaintiffs,

   v.

                                O R D E R

CITY OF STOCKTON, a public
entity, INTERNATIONAL FACILITIES
GROUP (IFG), a corporation dba
IFG-STOCKTON, INC., STOCKTON
POLICE OFFICER LT. TRULSON,
STOCKTON ASSISTANT CITY ATTORNEY
MICHAEL RISHWAIN, and DOES 1-40
in their individual and official
capacities, jointly and severally,

      Defendants.

_____/

    Plaintiffs are individuals who have brought suit against the

City of Stockton, various city officials, and the International

Facilities Group ("IFG"), alleging violations of their rights of

free speech under the United States and California Constitutions

in conjunction with their attempts to videotape and speak to the

public outside of performances of the Ringling Bros. - Barnum &

Bailey Circus ("Ringling Bros."). They seek damages, declaratory

1

relief, and injunctive relief.

On September 16, 2008, the court issued a preliminary injunction against the defendants requiring them to provide certain access to plaintiffs so as to enable them to lawfully exercise their First Amendment rights. Pending before the court is defendants' response to the court's order to show cause as to why defendants should not be held in contempt or sanctioned for the violation of that injunction.

Also pending before the court is a motion for summary judgment brought by defendants City of Stockton, Trulsson, and Rishwain and a cross-motion for summary judgment by plaintiffs. The plaintiffs' motion also seeks partial summary judgment against defendant IFG.

The court resolves the matters upon the papers and after oral argument and an evidentiary hearing on the order to show cause.

## I.  FACTS[1]

Plaintiffs are individuals interested in the welfare of animals and, to that end, are members of Citizens for Cruelty-Free Entertainment. They seek to make the public aware of mistreatment of animals in circuses by passing out leaflets and videotaping animals at the Ringling Bros. circus.

In 2006, the Ringling Bros. circus performed for the first time at the Stockton Arena, owned by the City of Stockton. The Arena is part of the Stockton Events Center, which includes a publically-owned baseball field and parking structure and

---

[1]All facts are undisputed unless otherwise noted.

privately-owned hotel, conference center, and retail stores. The Events Center is bounded by North Harrison Street, West Fremont Street, North Commerce Street, and the Stockton Channel.

The Arena and its facilities are managed, operated, and marketed by IFG-Stockton, Inc. ("IFG"), a Delaware corporation, pursuant to a Facilities Management Agreement with the City of Stockton. Among other provisions, the Facilities Management Agreement provides that IFG is responsible for administering security at events held in the Arena.

The Ringling Bros. circus performed at the Arena from August 31, 2006 to September 3, 2006. At that time, defendant Michael Rishwain was Assistant City Attorney and defendant Cris Trulsson was a City of Stockton police officer and the Event Commander assigned to work at the Arena. According to the Stockton Police Department's Operations Order related to the 2006 circus, the Police Department's mission was "to ensure the safe arrival, stay, and departure of the Ringling Bros. and Barnum & Bailey Circus employees and animals." Declaration of Cris Trulsson in Support of Motion for Summary Judgment ("Trulsson Decl.") ¶ 17, Ex. A.

**A.   Defendants' and Plaintiffs' Communications Prior to 2006 Circus**

Prior to the 2006 circus, employees of the City, IFG, and Ringling Bros. met to discuss "operational services, staffing, traffic flow management, and security," among other things. Trulsson Decl. ¶ 8; see also Declaration of Tara Bulzomi In Support of IFG's Opposition to Plaintiffs' Motion for Summary Judgment

1 ("Bulzomi Decl.") ¶ 7. At the meeting, Ringling Bros. employees

2 stated that at past events, animal rights activists had protested

3 the treatment of animals and had "engaged in criminal activity

4 against the circus, its employees and property." Id. ¶¶ 9-10. Among

5 those present at this meeting was IFG employee Tara Bulzomi.

6 Bulzomi Decl. ¶ 5. According to Ms. Bulzomi, the plaintiffs were

7 not discussed at this meeting. In fact, plaintiffs have directed

8 the court to Ms. Bulzomi's deposition testimony, in which she

9 testified that a security consultant for Ringling had informed her,

10 prior to the event, that plaintiffs were animal rights activists,

11 would likely be at the circus, but that "he did not believe there

12 was going to be any issues" and "they were very quiet, nonharmful

13 activists," who only "handed out leaflets, normally."[2] Declaration

14 of G. Whitney Leigh in Support of Plaintiffs' Motion for Summary

15 Judgment ("Leigh Decl.") Ex. A (Bulzomi Depo.) at 46:13-51-8.

16     At this meeting, IFG staff also discussed what would occur if

17 a protestor were to enter the queuing area in front of the Arena

18 during the circus. Declaration of Joseph Cuviello In Support of

19 Pls.' Notice of Errata (Doc. No. 149) Ex. D at 56:12-59:19, 62:1-8,

20 87:22-88:22. According to Ms. Bulzomi, the person would first be

21 asked to leave. Id. If that person did not leave, an IFG security

22

23     [2]Although plaintiffs represent that defendant Trulsson
testified that in the pre-event meeting, the participants were told
24 by a Ringling Bros. representative that the plaintiffs "were
provocative and confrontational and could be a problem," Pls.'
25 Reply In Support of Mot. for Summ. J. at 30, the deposition
testimony presented does not identify who told Trulsson this or
26 when. See Declaration of Joseph Cuviello In Support of Pls.' Notice
of Errata (Doc. No. 149) Ex. B at 19:1-6.

officer would be called. If the security officer "had an issue," he could call a police officer. Id. If IFG staff decided to effectuate a citizens arrest in lieu of calling the police, the only staff member who could do so was IFG Director of Events Operations Todd Larios. Id. Defendant Trulsson has testified that, although he does not recall saying this at the meeting in question, it would have been his practice to explain to IFG staff at the meeting that the police would view a citizens arrest for trespass on private property as lawful. Id. Ex. B at 99:6-25.[3] He also testified that he understood IFG to be in control of the Arena property. Id. at 108:20-25.

Approximately a month before the circus, IFG Director of Events Todd Larios sent a memo to two other persons stating that "The Stockton Arena has met with the circus and their security advisors to review possible concerns and threats to the venue and the shows." Leigh Decl. Ex. E. Accordingly, he "request[ed]/suggest[ed]" various steps be taken during the circus, including disbursing security personnel through the arena, enforcing a "zero tolerance" policy towards criminal activity including trespass, monitoring of the walk of the animals to the Arena by the police, limiting pedestrian traffic on Ring Road to circus attendees. Id. He identified as particular "areas of concern for potential criminal activity" the Arena garage, where

---

[3] The deposition transcript plaintiffs have submitted is missing the remainder of Trulsson's testimony on this topic. See Declaration of Joseph Cuviello In Support of Pls.' Notice of Errata (Doc. No. 149) Ex. D.

demonstrators could conceal themselves and possibly throw items at the staff and animals; the "north lot compound," which was "public and . . . open for demonstrations," although demonstration permits should be required; the staged equipment along Ring Road, which could be vandalized; and the Arena itself, which could be subject to bomb threats. Id.

Before the 2006 circus began, plaintiff Bolbol spoke to defendant Rishwain by telephone. During the conversation, Rishwain stated that Bolbol could exercise her right to free speech "on the public sidewalks at either of the two entrances to the Arena and a designated protest area across the street from the eastern entrance."[4] Defendants' Separate Statement of Undisputed Facts ¶ 30. Rishwain believed that from these locations, plaintiffs would have access to everyone attending the circus. Although Bolbol stated that she wanted access to the areas around the ticket office, Rishwain informed her that that area would be congested with pedestrians and her presence would interfere with pedestrian traffic.

**B.   August 28, 2006 Street Closure**

On August 28, 2006, circus animals were walked from the Port of Stockton to the Arena, which entailed a walk of approximately 2.7 miles. During the walk, an approximately half-mile section of Washington Street was closed to pedestrians. Stockton Police

---

[4]Plaintiffs dispute that they actually had access to these areas during the circus. Plaintiffs' Response to Defendants' Separate Statement of Undisputed Material Facts in Support of Motion for Summary Judgment ¶ 30.

Sergeant Jan Goodnight has declared that she made the decision to close this portion of the street. Declaration of Jan Goodnight in Support of Motion for Summary Judgment ("Goodnight Decl.") ¶¶ 10-12. She stated that she found that section of the road to be "visibly narrower in width than the rest of the route" that would be used for the animal walk. Id. ¶ 11. This section of the road also had no sidewalk on the west side of the street and a drop-off at that shoulder of the road. Id. ¶¶ 11-12. The east side of the road also lacked a paved sidewalk, but had a "narrow and uneven dirt footpath." Id. ¶ 11. For these reasons, she stated that pedestrians would likely be standing in close proximity to the animals as they passed, which "might spook the animals, injure participants, or worse." Id. ¶ 12. She had previously been informed in a meeting with IFG and Ringling Bros. representatives that, in the past, animal rights groups have intentionally disrupted animal walks by spooking the animals or standing in front of the animals. Id. ¶ 7.

Sergeant Goodnight declared that her concerns about the width of the road and absence of sidewalks led her to close this portion of Washington Street by placing "No Pedestrian" signs at both ends of this section of the route. Id. Plaintiffs dispute that these concerns were the reasons for the partial street closure and contend that the closed portions of Washington Street were "indistinguishable" from the other areas on the animal walk route. Plaintiffs' Response to Defendants' Separate Statement of Undisputed Material Facts in Support of Motion for Summary Judgment

7

("Pls.' Response to SSUF") ¶ 19. While the section of the street was closed, an observer could stand at one end of the closure and view the animals as they walked down the closed portion, although plaintiffs contend that a person could not view the animals "in a meaningful way." Id. ¶ 25.

This portion of Washington Street remained closed for approximately twenty minutes. During this time, plaintiffs approached the closed portion of the street and encountered two Stockton Police officers nearby. Declaration of Deniz Bolbol In Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment ("Bolbol Decl.") ¶ 17; Declaration of Joseph Cuviello In Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment ("Cuviello Decl.") ¶ 11. When asked, the officers told Bolbol that the street was closed for safety reasons. Id. Because of the street closure, Bolbol and Cuviello separated, so that they could videotape the animal walk at each end of the closure. Id. ¶¶ 18-20. Each plaintiff has declared that being separated caused them stress, as Cuviello did not have a cell phone and so they could not contact each other "if something were to happen to one of [them]." Bolbol Decl. ¶ 21; Cuviello Decl. ¶ 14. Plaintiffs videotaped the animal walk without accessing the closed portion of the street.[5]

_____

[5]In their Response to Defendants' Separate Statement of Undisputed Facts, plaintiffs assert that the closure "prevented [plaintiffs] from videotaping the animals with sufficient proximity to observe animal mistreatment, which was one of Plaintiffs' primary goals," although this assertion is not supported by any evidence tendered to the court. See Pls.' Response to SSUF ¶ 28.

They were prevented from accessing this portion of Washington Street for approximately fifteen to sixteen minutes. During this time, plaintiff Cuviello has declared that he observed several pedestrians walking on the closed portion of the street. Cuviello Decl. ¶ 16.

**C.   August 31, 2006 Events**

On August 31, 2006, the plaintiffs and two other animal rights activists went to the Arena to pass out leaflets and hold signs and banners. Bolbol Decl. ¶ 24; Cuviello Decl. ¶ 17. As they entered Arena property, two Stockton Police officers told them it was private property. Bolbol Decl. ¶ 25; Cuviello Decl. ¶ 18. The officers called Lieutenant Trulsson,[6] who arrived and informed plaintiffs that the area was private property and if the Arena staff believed plaintiffs to be trespassing, it is Stockton Police policy to honor a citizens' arrest. Bolbol Decl. ¶ 26; Cuviello Decl. ¶ 20. Trulsson indicated that this was in accord with what Rishwain had told Bolbol in their phone conversation. Cuviello "tried to explain the law" to Trulsson, but Trulsson contended that the penal code "says he has to accept a citizen's arrest." Cuviello Decl. ¶¶ 21, 23, 25. Trulsson then explained that it was City

_____

[6]Trulsson had visited the Ringling Bros. circus in San Jose a few days prior and had observed "animal rights groups protesting" there. Declaration of Cris Trulsson in Support of Motion for Summary Judgment ("Trulsson Decl.") ¶ 14. He also had been informed by the Stockton Police Vice-Intelligence Unit that the plaintiffs followed the Ringling Bros. circus "to protest the treatment of animals" and that he "was generally on notice that [plaintiffs] might be confrontational, try to disrupt the animal walks or the shows, and/or document perceived violations of their rights for a lawsuit." Id. ¶ 15

policy to accept a citizen's arrest by IFG staff, but would only accept a citizens arrest by plaintiff Cuviello if it was "a lawful arrest." Id. ¶ 26. Trulsson was polite and did not raise his voice to or touch the plaintiffs during this conversation.

After Lieutenant Trulsson left, the IFG Director of Events arrived and instructed plaintiffs to leave the Arena property. Id. ¶ 28. Plaintiff Cuviello left, moving to the public sidewalk to leaflet. Id. Plaintiff Bolbol moved to the Arena's back parking lot to leaflet patrons and was told by the Director of Events that if she did not have a ticket and refused to leave Arena property, he would place her under citizens arrest. Bolbol Decl. ¶ 28. Cuviello has declared that "[d]ue to the threat of arrest, and [his] fear of being arrested, [he] did not attempt to access Stockton Arena property during the following two days [he] was in Stockton to leaflet patrons and videotape the animals. Cuviello Decl. ¶ 29.

**D.   September 2, 2006 Events**

Plaintiff Bolbol returned on September 2, 2006 to leaflet patrons. Bolbol Decl. ¶ 29. When she entered the Arena property, an IFG representative stopped her and Sergeant Goodnight then arrived. Id. Bolbol was acting peacefully. Id. ¶ 32. "[W]ithout being prompted by the IFG representative, [Sergeant Goodnight] asked security if they wanted to arrest" Bolbol. Id. Another IFG representative told Bolbol that she would be arrested if she remained on Arena property, and Bolbol left the property. Id. Bolbol declared that the threats of arrest and fear of being arrested caused her not to return to the Arena area on September

10

1  3, 2006. Id. ¶ 30. She also declared that the experience caused her

2  to feel angry and frustrated. Id. ¶ 31.

3  **E.    2007 Events**

4      The circus returned to the Stockton Arena in 2007. Defendant

5  Rishwain was no longer an Assistant City Attorney and defendant

6  Trulsson was no longer assigned to work at the Arena during the

7  circus.

8      On September 12, 2007, Cuviello returned to the blocked

9  portion of Washington Street to videotape the animal walk. Cuviello

10 Decl. ¶ 37. Initially, two officers there told Cuviello that he

11 could not access a portion of the street. Id. Stockton Police

12 Lieutenant Paoletti then arrived and allowed Cuviello access. Id.

13 By that time, Cuviello had missed some of the animal walk. Id.

14     On September 16, 2007, Cuviello went to the same portion of

15 Washington Street to videotape the animal walk. Id. ¶ 38. Cuviello

16 had confirmed with Stockton Police Sergeant Chuck Flesher that he

17 could access the entire street during the walk. Id. When Cuviello

18 arrived, however, the officers there attempted to bar his access.

19 Id. Cuviello ignored them and accessed the street. Id.

20 **F.    Procedural History**

21     Plaintiffs filed a complaint in this court on August 9, 2007

22 alleging violations of their rights surrounding the 2006 circus

23 performances at the Stockton Arena.[7] They named as defendants the

24

25     [7]Plaintiffs have subsequently amended their complaint,
   although the amended complaint does not appear to base any of its
26 causes of action on alleged misconduct during the 2007 circus. See
   First Amended Complaint. In any event, the complaint on which the

1  City of Stockton, Lieutenant Trulsson, Assistant City Attorney

2  Rishwain, and IFG. The allege causes of action against all

3  defendants for violation of their rights under 42 U.S.C. § 1983

4  based on interference with their rights under the First and

5  Fourteenth Amendments of the United States Constitution, and the

6  Liberty of Speech and Press Clause and Article 1, Section 7(a) of

7  the California Constitution. They also allege all defendants

8  violated California Civil Code § 52.1. Finally, they allege all

9  defendants conspired to deprive plaintiffs of their rights under

10 the federal and state constitutions.

11      Plaintiffs seek declaratory and injunctive relief. They also

12 seek "compensatory, general, and special damages against all

13 defendants in an amount according to proof which is just and fair"

14 and exemplary damages against each defendant except the City, in

15 order to "deter and make an example of those defendants." Compl.

16 Prayer for Relief.

17      On August 8, 2008, the plaintiffs moved for a preliminary

18 injunction against all defendants to ensure their rights would not

19 be violated at the 2008 Ringling Bros. circus at the Stockton

20 Arena. The court granted an injunction, ordering as follows:

21      1.    From September 18 through 21, 2008, plaintiffs
            shall be permitted full access to the public fora
22          surrounding the Stockton Arena, including parking
            lots and public walkways, without interference from
23          International Facilities Group or its agents or the
            City of Stockton or its agents.

24 _____

25 pending motions for summary judgment relate is the original
   complaint, which only raised allegations relating to the 2006
26 circus.

2.   From September 18 through 21, 2008, plaintiffs shall be permitted full access to the public streets, including W. Washington Street, of the City of Stockton, without interference from International Facilities Group or its agents or the City of Stockton or its agents.

3.   From September 18 through 21, 2008, plaintiffs shall be permitted to distribute leaflets and videotape in any public streets and any public fora areas surrounding the Stockton Arena.

## G.   Events Surrounding the 2008 Circus

On October 1, 2008, the plaintiffs moved for an order to show cause as to why defendants should not be held in contempt or sanctioned for violating the court's September 16, 2008 preliminary injunction. The court has received documentary evidence and testimony on this motion.

None of the parties dispute that plaintiffs attempted to access certain areas around the Stockton Arena during the dates covered by the preliminary injunction. The parties do dispute, however, the characterization of what occurred.

According to plaintiffs, they attempted first to distribute leaflets and videotape animals around the Stockton Arena on September 18, 2008. Declaration of Deniz Bolbol In Support of Application For an Order to Show Cause Why Defendants Should Not Be Held In Contempt and Sanctioned ("Bolbol OSC Decl.") ¶ 7. Plaintiff Bolbol was told by IFG staff that she could not leaflet "there" and that she had to move "across the roadway." Id. A Stockton Police Officer arrived, who also asked Bolbol to move. Id. A Stockton Police Sergeant, Sergeant Christianson, also arrived, who blocked Bolbol's access to circus patrons. Id.

13

1    Later, Christianson told Bolbol she would be arrested for
2    trespassing if she did not "leave the area where the animals are
3    walked from the compound to the arena and back." Id. ¶ 8. He also
4    made a similar statement to plaintiff Cuviello, who was videotaping
5    the animals. Declaration of Joseph Cuviello In Support of
6    Application For an Order to Show Cause Why Defendants Should Not
7    Be Held In Contempt and Sanctioned ("Cuviello OSC Decl.") ¶ 7.
8    Eventually, Stockton Police Captain Paoletti arrived and informed
9    the officers that the plaintiffs could remain where they were.
10   Bolbol OSC Decl. ¶ 8.

11   On September 20, 2008, plaintiff Bolbol returned to the area
12   around the Stockton Arena and videotaped animals from the parking
13   lot. Id. ¶ 9. According to her testimony and a videotape, a City
14   police officer, Officer Bender, "approached [her], from behind, and
15   told [her] [she] was not allowed to loiter, threatened to arrest
16   [her] and proceeded to violently reach towards [her] camera." Id.
17   He then "followed" plaintiff, "cornering" her against a pillar. Id.
18   A police sergeant, Sergeant Flynn, arrived and threatened to arrest
19   plaintiff for loitering. Id. Again, Captain Paoletti later arrived
20   and informed the officers that Bolbol could videotape from the
21   parking lot. Id.

22   Plaintiffs submitted video clips of the described events,
23   Cuviello OSC Decl. Ex. A, which the court has reviewed. The court
24   also received testimony from both plaintiffs; Charles Kemp, general
25   manager of the Stockton Arena; Sergeant Christianson; Officer
26   Bender; Sergeant Flynn; and Captain Paoletti.

14

## II.  STANDARDS

**A.  Standard for a Motion for Summary Judgment Pursuant to Federal Rule of Civil Procedure 56**

Summary judgment is appropriate when there exists no genuine issue as to any material fact. Such circumstances entitle the moving party to judgment as a matter of law. Fed. R. Civ. P. 56(c); see also Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Secor Ltd. v. Cetus Corp., 51 F.3d 848, 853 (9th Cir. 1995). Under summary judgment practice, the moving party

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish the existence of a genuine issue of material fact. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-86 (1986); see also First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968); Secor Ltd., 51 F.3d at 853. In doing so, the opposing party may not rely upon the denials of its pleadings, but must tender evidence of specific facts in the form of affidavits and/or other admissible materials in support of its contention that the dispute exists. Fed. R. Civ. P. 56(e); see also First Nat'l Bank, 391 U.S. at 289. In evaluating the evidence, the court draws all reasonable

1   inferences from the facts before it in favor of the opposing party.

2   Matsushita, 475 U.S. at 587-88 (citing United States v. Diebold,

3   Inc., 369 U.S. 654, 655 (1962) (per curiam)); County of Tuolumne

4   v. Sonora Cmty. Hosp., 236 F.3d 1148, 1154 (9th Cir. 2001).

5   Nevertheless, it is the opposing party's obligation to produce a

6   factual predicate as a basis for such inferences. See Richards v.

7   Nielsen Freight Lines, 810 F.2d 898, 902 (9th Cir. 1987). The

8   opposing party "must do more than simply show that there is some

9   metaphysical doubt as to the material facts . . . . Where the

10  record taken as a whole could not lead a rational trier of fact to

11  find for the nonmoving party, there is no 'genuine issue for

12  trial.'"  Matsushita, 475 U.S. at 586-87 (citations omitted).

13  **B.    Standard for Contempt for Violation of a Court Order**

14      The court has broad discretion to determine whether a person

15  should be held in contempt of a court order. Gifford v. Heckler,

16  741 F.2d 263, 266 (9th Cir. 1984). A person fails to act as ordered

17  by the court when he fails to take "all the reasonable steps within

18  [his] power to insure compliance with the [court's] order [ ]."

19  Sekaquaptewa v. MacDonald, 544 F.2d 396, 406 (9th Cir. 1976), cert.

20  denied, 430 U.S. 931, 97 S.Ct. 1550 (1977)). A person may be held

21  in contempt even if there is no evidence that he intended to

22  disobey the order. McComb v. Jacksonville Paper Co., 336 U.S. 187,

23  191 (1949); Perry v. O'Donnell, 759 F.2d 702, 704-06 (9th Cir.

24  1985); Donovan v. Mazzola, 716 F.2d 1226, 1240 (9th Cir. 1983),

25  cert. denied, 464 U.S. 1040 (1984).  Although "[t]he sole question

26  is whether a party complied with the district court's order," a

16

1  party can escape contempt by demonstrating that he is unable to

2  comply. <u>Mazzola</u>, 716 F.2d at 1240.

3                          **III. ANALYSIS**

4      Defendants City of Stockton, Trulsson, and Rishwain ("City

5  defendants") move for summary judgment on all of plaintiffs' causes

6  of action, which are based on allegations concerning the 2006

7  circus. The court grants the motion in part and denies it in part.

8      Plaintiffs have cross-moved against the City defendants and

9  moved for summary judgment against IFG on all causes of action. The

10 court grants the plaintiff's motion in part and denies it in part.

11     The City defendants and IFG have responded to the court's

12 order to show cause. Based on their response and the plaintiffs'

13 reply, the court holds the City of Stockton in contempt.

14 **A.   City Defendants' and Plaintiffs' Cross-Motions for Summary**

15     **Judgment**

16     **1.   Qualified Immunity**

17     Defendants Trulsson and Rishwain contend they are immune from

18 liability for plaintiffs' section 1983 causes of action, which

19 allege violations of the plaintiffs' rights to free speech under

20 the federal and state constitutions. The court grants this in part

21 and denies it in part.

22     A government official is immune from liability for

23 discretionary functions, so long as the official's conduct "does

24 not violate clearly established statutory or constitutional rights

25 of which a reasonable person would have known." <u>Harlow v.</u>

26 <u>Fitzgerald</u>, 457 U.S. 800, 818 (1982). Plaintiffs here do not

                                17

1  dispute that the City defendants were engaging in discretionary

2  functions, for the purposes of the qualified immunity analysis.

3       The determination of whether or not a state official enjoys

4  qualified immunity proceeds in two parts. First, the court must

5  determine whether the facts show that the official's conduct

6  violated a constitutional right. Saucier v. Katz, 533 U.S. 194, 201

7  (2001). If so, the court undertakes the second step of the

8  analysis, which is whether the constitutional right was "clearly

9  established" at the time of the violation. Id. A right is clearly

10 established if a reasonable official would have understood that his

11 actions violated that right. Id. at 202. The plaintiff bears the

12 burden to show that the law regarding the Constitutional violation

13 was settled at the time of the violation. Gasho v. United States,

14 39 F.3d 1420, 1438 (9th Cir. 1994). This showing shifts the burden

15 to the defendants to show that a reasonable official could have

16 believed, in light of settled law, that his conduct did not violate

17 the law. Id.

18              a.   Violation Of a Constitutional Right

19      Plaintiffs allege the City defendants violated their rights

20 under the federal and state constitutions in two ways: 1) by

21 restricting their access to Washington Street on August 28, 2006;

22 and 2) by indirectly restricting plaintiffs' access to Arena

23 property by informing them that the City would honor a citizens'

24 arrest for trespassing for accessing all areas around the Arena.

25 The court considers each in turn.

26 ////

1                    **i.   Closure of Washington Street**

2       As the court explained in the preliminary injunction, both the

3   federal   and   state   constitutions   provide   that   "permissible

4   restrictions on expression in public fora must be content-neutral,

5   be narrowly tailored to serve an important government interest, and

6   leave open ample alternative channels for the communication of the

7   message." <u>Kuba v. 1-A Agr. Ass'n.</u>, 387 F.3d 850, 856 (9th Cir.

8   2004). Public streets are quintessential public fora. <u>Cornelius v.</u>

9   <u>NAACP Legal Defense and Educ. Fund</u>, 473 U.S. 788, 802 (1985).

10  Protesting, handing out leaflets, and videotaping are activities

11  protected by the First Amendment. <u>Kuba</u>, 387 F.3d at 856; <u>Fordyce</u>

12  <u>v. City of Seattle</u>, 55 F.3d 436, 439 (9th Cir. 1995).

13      Plaintiffs   appear   not   to   dispute   that   the   closure   of

14  Washington Street was content-neutral. <u>See</u> Pls.' Opp'n. to Mot. for

15  Summ. J. at 13-14. On its face, it appears to be. Although there

16  is evidence that Lieutenant Trulsson was given information prior

17  to the circus that led him to believe the plaintiffs may disrupt

18  the circus or the animal walk, the only evidence tendered to the

19  court   shows   that   Lieutenant   Trulsson   was   not   involved   in   the

20  decision to close part of Washington Street. <u>See</u> Goodnight Decl.

21  ¶¶ 10-12. There is no evidence that Sergeant Goodnight, who made

22  the decision to close the street, was aware of the plaintiff's

23  desire to use the street to engage in First Amendment activities

24  and that she closed the street for that reason.[8]

25  ───────────────

26      [8]Defendants Trulsson and Rishwain, curiously, do not seek
    summary   judgment   on   the   grounds   that,   to   the   extent   that

                                   19

1    Plaintiffs dispute that the closure was narrowly tailored to

2  serve a significant government interest. As the court explained in

3  its September 16, 2008 order, prevention of traffic congestion and

4  "ensuring the safety of pedestrians and drivers" are significant

5  governmental interests. Kuba, 387 F.3d at 858; see also Heffron v.

6  Int'l Soc'y for Krishna Consciousness, Inc., 452 U.S. 640 (1981);

7  Foti v. City of Menlo Park, 146 F.3d 629 (9th Cir. 1998). However,

8  mere invocation of these interests is not sufficient; the City

9  "must also show that the proposed communicative activity endangers

10 those interests." Kuba, 387 F.3d at 859. In Kuba, for example, the

11 Ninth Circuit held that the mere assertion of traffic flow and

12 pedestrian safety was inadequate to justify the denial of

13 pedestrian access to the parking lots and walkways immediately

14 outside of an arena. Id. at 859-60. There, the government had

15 blocked off those areas when a circus or rodeo was performing in

16 the arena, based on the speculation that if demonstrators were

17 allowed in those areas, they would cause "congestion and danger to

18 safety." Id. at 860. Without some type of showing, such as a

19 history of past protestors causing such dangerous congestion, the

20 court concluded that the government had not shown that public

21 safety would be endangered by the "addition of a handful of

22 individuals" protesting immediately outside of the arena. Id.

23    Here, defendants have offered some evidence that the closure

24

25 plaintiffs' allegations concern the Washington Street closure,
   neither defendant was involved with this decision, although they
26 do oppose plaintiffs' motion on this basis.

of the street was narrowly tailored to serve a significant government interest. Sergeant Goodnight declared that the section of Washington Street that was closed was "visibly narrower in width than the rest of the route." Goodnight Decl. ¶ 11. The east side of the street had a "narrow and uneven dirt footpath" and on the west side of the street there was "an absence of a sidewalk, a drop off where the road winds around, and an open, overgrown field beyond that" Id. She has submitted photographs of this area that confirms her characterization.[9] See id. Ex. B. She further declared that "given the width of the roadway, the lack of a sidewalk, and the drop off along the west side of the road," pedestrians' close proximity to the animals during their walk "might spook the animals, injure participants, or worse." Id. ¶ 12.

Moreover, the partial street closure constituted only a half-mile of the 2.7-mile route. The plaintiffs were able to videotape the animal walk along other portions of the route. Therefore, unlike the evidence tendered for the motion for preliminary injunction, the evidence before the court at present shows that defendants' conduct only minimally barred plaintiffs from accessing the animal route. As such, it appears that the defendants' action in closing the street was narrowly tailored to their stated safety interests.

---

[9] Plaintiff have tendered evidence in the form of a video recording of portions of the events that occurred on August 31, 2008 to rebut defendants' characterization of the closure. Cuviello Decl. Ex. A. The video, however, shows little of the part of the street that was closed. See id. What is shown confirms Sergeant Goodnight's characterization of the street.

1     Finally, plaintiffs appear not to dispute that there were

2 ample alternative channels for their communicative activities. <u>See</u>

3 Pls.' Opp'n. to Mot. for Summ. J. at 13-14; Pls.' Mot. for Summ.

4 J. at 18-21.

5     Accordingly, defendants' motion for summary judgment is

6 granted to the extent that Trulsson and Rishwain were involved in

7 the decision to close a portion of Washington Street on August 28,

8 2006, as that closure did not violate plaintiffs' freedom of speech

9 rights under the United States or California Constitutions.

10     **ii.   Restrictions  on  Plaintiffs'  Access  to  Property**

11               **Surrounding the Arena**

12     On August 31, 2006 both plaintiffs attempted to enter the

13 property surrounding the Arena and both times were told to leave

14 by IFG personnel.[10] IFG's decision was confirmed by Lieutenant

15 Trulsson. Moreover, prior to the circus' arrival, defendant

16 Rishwain told Bolbol that her access to areas around the Arena was

17 restricted during the circus.

18     Again, the activities in which plaintiffs sought to engage

19 fall under the ambit of the free speech rights protected by the

20 federal and state constitutions. <u>Kuba</u>, 387 F.3d at 856; <u>Fordyce</u>,

21 55 F.3d at 439. The sidewalks and parking areas around the Arena

22 are traditional public fora, subject to reasonable time, place, and

23

_____

24     [10]On September 2, 2006, plaintiff Bolbol apparently entered
the property around the Arena and was told to leave by IFG
25 personnel, which was supported by Sergeant Goodnight. Bolbol Decl.
¶ 29. Sergeant Goodnight is not named as a defendant in the
26 operative complaint.

1  manner restrictions, which defendants acknowledge. <u>Perry Educ.</u>

2  <u>Ass'n. v. Perry Local Educators' Ass'n.</u>, 460 U.S. 37, 45 (1983);

3  <u>see</u> Mot. for Summ. J. at 17, 19; <u>see also</u> Order, Sept. 15, 2008 at

4  17-18 (areas open to the public around the Arena are "public

5  fora").

6       Preliminarily, there is evidence on the record that both

7  Trulsson and Rishwain were aware of the content of plaintiffs'

8  speech prior to their contacts with plaintiffs. Trulsson Decl. ¶

9  15 (describing having received information that Bolbol and Cuviello

10  may "be confrontational [or] try to disrupt the animal walk or the

11  shows" with their animal rights protests); Rishwain Decl. ¶ 19

12  (acknowledging that he may have told Bolbol that he was familiar

13  with plaintiffs' similar suit against the City of San Jose related

14  to animal rights activities at the circus there).

15       In plaintiffs' motion for summary judgment they assert that

16  the speech restrictions imposed on them at the Stockton Arena by

17  the City defendants were content-based.[11] <u>See</u> Pls.' Mot. for Summ.

18  J. at 21. They premise this argument solely on the fact that

19  plaintiffs were the only people around the Arena who were asked to

20  leave the property around the Arena, as evidenced by plaintiffs'

21  video evidence.

22       Plaintiffs have tendered some evidence to establish that

23  defendants' actions were content-based. On one hand, although the

24  ───────────────────

25       [11]Plaintiffs failed to raise this in opposition to defendants'
   motion for summary judgment. <u>See</u> Pls.' Opp'n to Mot. for Summ. J.
26  at 14-16.

video submitted shows plaintiffs being asked to leave the area around the Arena, it does not show much more than this, in terms of the events that unfolded around the Arena on August 31, 2006. It does not reveal whether other persons around the Arena were detained or hindered from entering the Arena's grounds and, if so, under what circumstances.

On the other hand, the evidence tendered indicates that defendant Trulsson expressed to plaintiffs in his encounter with them on August 31, 2006, that they were permitted to communicate with the public entering the Arena, but from a location on a different part of the sidewalk. See Cuviello Decl. Ex. A, Video clip 4-5; Bolbol Decl. ¶ 26. There is similar evidence tendered that defendant Rishwain told plaintiffs essentially the same thing, that plaintiffs could participate in "free speech activities," but that the City would defer to IFG if the latter did not want those activities to take place on Arena property. Bolbol Decl. ¶ 13. Accordingly, there is evidence from which it could reasonably be inferred that it was specifically because plaintiffs were engaged in speech activities that the defendants were restricting their access to the Arena and, specifically, that it was the content of the speech that troubled IFG, whose restrictions on plaintiffs were adopted by the City defendants. Although plaintiffs have not established this element so conclusively as to warrant summary judgment in their favor, the evidence is sufficient to defeat defendants' motion on this issue.

Moreover, in order to be lawful under the United States and

California Constitutions, content-neutral restrictions on speech must be narrowly tailored to serve an important government interest, and leave open ample alternative channels for the communication of the message. <u>Kuba</u>, 387 F.3d at 856. Defendants Rishwain and Trulsson did not comply with this requirement.

Plaintiffs assert that Trulsson and Rishwain violated their rights under the state and federal constitutions by informing them that, if the plaintiffs did not abide by IFG's restrictions on their presence around the Arena and if IFG subsequently executed a citizens' arrest of plaintiffs for trespassing, the City would honor that arrest. There is no dispute that Lieutenant Trulsson made statements to this effect. <u>See</u> SSUF ¶ 40. Defendant Rishwain declared that he informed Bolbol that the plaintiffs could only access "public sidewalks and . . . the entrances to the Arena" out of concern for pedestrian traffic, but that these areas would give plaintiffs full access to everyone entering and leaving the Arena. Rishwain Decl. ¶ 17. Bolbol disputes this, in that she has declared that Rishwain also told her that the City Attorney had instructed the police to accept IFG's citizens' arrests. Bolbol Decl. ¶ 13. Finally, plaintiffs have presented undisputed evidence that they attempted to access the walkways and parking lots around the Arena, but were told to leave by IFG personnel.[12]

This evidence establishes that Trulsson and Rishwain's

---

[12]Although defendants dispute this in their Statement of Undisputed Facts, <u>see</u> SUF ¶ 34, they have tendered no evidence that actually contradicts plaintiffs' evidence.

limitations were not narrowly tailored to serve an important government interest. As the Ninth Circuit explained in a similar case, persons who wish to express their views in public fora cannot be restricted simply because their presence may annoy other patrons. <u>Kuba</u>, 387 F.3d at 857. Although concern for pedestrian safety may be a significant governmental interest, the City defendants must show that plaintiffs' speech activities actually endangered those interests. <u>Id.</u> at 858-59. Here, defendants Rishwain and Trulsson have made no such showing. Both defendants communicated to the plaintiffs that there were certain areas around the Arena plaintiffs would not be permitted to access. Rishwain communicated this directly, in his conversation with Bolbol prior to the circus' opening night. Rishwain Decl. ¶ 17; Trulsson Decl. ¶ 16. Defendant Trulsson communicated this indirectly, by informing plaintiffs that they must abide by the restrictions on access that IFG representative imposed, or else face arrest. Trulsson Decl. ¶ 19.

The problem with these limitations is that defendants have not offered any justification for them. Although Rishwain invokes a general concern for pedestrian safety, there is no evidence from which it could be inferred that pedestrian safety would in fact have been endangered by plaintiffs' desired speech activities. For example, although Trulsson declared that he observed the protestors at the San Jose circus but did not indicated that those protestors impeded or endangered pedestrian traffic. <u>See</u> Trulsson Decl. ¶ 14. There is no other evidence that the plaintiffs' activities or

1  similar speech activities in the past had endangered pedestrians
2  at other events. See Kuba, 387 F.3d at 860. Like Kuba, there is no
3  evidence that the two plaintiffs and the two people accompanying
4  them on August 31, 2006 would have increased congestion to such an
5  extent as to endanger pedestrian safety. See id. at 860-61; see
6  also Bolbol Decl. ¶ 24. Finally, although Trulsson was informed
7  that before the circus that plaintiffs "might be confrontational
8  [and/or] try to disrupt the animal walk or shows," there is nothing
9  offered to substantiate this belief or explain on what facts it was
10 based. See Trulsson Decl. ¶ 15. Accordingly, the court concludes
11 that Rishwain and Trulsson violated plaintiffs' speech rights on
12 August 31, 2006, in violation of the United States and California
13 Constitutions.

14      The court then considers the second step of the qualified
15 immunity analysis: whether the law was clearly established at the
16 time of the violation, such that reasonable officials in the
17 defendants' positions would have known they were violating the law.
18 It is no stretch to conclude that this step of the inquiry has been
19 met. The "time, place, and manner" standard for restricting speech
20 in public fora is a well-established rule. See Frisby v. Schultz,
21 487 U.S. 474 (1988); Perry, 460 U.S. at 45; United States Postal
22 Serv. v. Council of Greenburgh, 453 U.S. 114, 132 (1981); Consol.
23 Edison Co. v. Public Service Comm'n, 447 U.S. 530, 535-536 (1980);
24 Cantwell v. Connecticut, 310 U.S. 296 (1940); Schneider v. State
25 of New Jersey, 308 U.S. 147 (1939). Specifically, the requirement
26 that the state actor have actual evidence justifying the

27

1  restriction on speech is also long-standing. <u>Nixon v. Shrink</u>
2  <u>Missouri Gov't PAC</u>, 528 U.S. 377, 392 (2000) ("We have never
3  accepted mere conjecture as adequate to carry a First Amendment
4  burden."); <u>see also</u> <u>Lim v. City of Long Beach</u>, 217 F.23d 1050, 1054
5  (9th Cir. 2000). Finally, only two years before the relevant
6  incidents occurred in this case, the Ninth Circuit issued its <u>Kuba</u>
7  opinion, in which it engaged in a time, place, and manner analysis
8  of a city's restrictions on animal rights activists' speech
9  activities outside of an arena. <u>Kuba</u>, 387 F.3d at 852. In it, the
10 court gave clear guidance on what showing of proof would need to
11 be made in order to justify the type of speech restriction the
12 defendants engaged in in the instant case. <u>Id.</u> at 858. Given the
13 clarity and weight of authority extant at the time of the incident,
14 the law was clearly established such that reasonable officials in
15 Trulsson and Rishwain's positions would have known their conduct
16 violated the law.[13]

17     Accordingly, defendants' motion for summary judgment on the
18 grounds of qualified immunity is therefore denied as to defendants
19 Rishwain and Trulsson, to the extent that plaintiffs' claims allege
20 violation of their freedom of speech rights on August 31, 2006.
21 Plaintiffs' motion for summary judgment is granted against
22 defendants Rishwain and Trulsson on the issue of whether each is

23

24     [13]That defendant Trulsson assertedly relied on the erroneous
   advice of defendant Rishwain is of no import to the qualified
25 immunity analysis, as "a reasonable competent public official
   should know the law governing his conduct." <u>Harlow v. Fitzgerald</u>,
26 457 U.S. 800, 818-19 (1982).

1  entitled to qualified immunity for the violation of plaintiffs'

2  rights on August 31, 2006.[14]

3      **2.  Third and Fourth Causes of Action**

4      The City defendants and plaintiffs cross-move for summary

5  judgment on plaintiffs' third and fourth causes of action, in which

6  plaintiffs allege violations of their equal protection rights under

7  the federal and state constitutions, respectively. The court denies

8  all parties' motions as to these claims.

9      The Fourteenth Amendment of the United States Constitution and

10  Article 1, Section 7(a) both prohibit the denial of any person's

11  equal protection of the law. The California equal protection

12  provision in interpreted in the same manner as its federal

13  counterpart. <u>Bd. of Supervisors of Sacramento County v. Local</u>

14  <u>Agency Formation Comm'n.</u>, 3 Cal. 4th 903 (1992).

15      State action that classifies individuals so as to deny a

16  certain group their fundamental rights is analyzed with strict

17  scrutiny. <u>Trimble v. Gordon</u>, 430 U.S. 762, 774 (1977); <u>Memorial</u>

18  <u>Hospital v. Maricopa County</u>, 415 U.S. 250, 258 (1974). First

19  Amendment freedoms are fundamental rights for equal protection

20  purposes. <u>Police Dep't of City of Chicago v. Mosley</u>, 408 U.S. 92,

21  94-95 (1972).

22      Plaintiffs contend that California Penal Code section 602,

23

24      [14]Plaintiffs have not addressed in their motion or opposition
to the defendants' motion the standards for injunctive or
declaratory relief, nor have they addressed the amount of damages
25  to which they may be entitled on these causes of action. The court
therefore has no basis at this time upon which to grant the relief
26  plaintiffs requested in their complaint.

which prohibits trespassing, violates the equal protection clause as applied, because the City defendants applied it differently to protestors and non-ticket holders at the Stockton Arena (the groups to which plaintiffs purport to belong) than they applied it to ticketholders and non-protestors. In order to succeed on this claim, the plaintiffs must show that the defendants possessed a discriminatory animus. Snowden v. Hughes, 321 U.S. 1, 7-8 (1944). This evidence must be more than the mere inference of discrimination arising from the action itself, because selective or lax enforcement of laws alone does not constitute an equal protection violation. Id.; see also Freeman v. City of Santa Ana, 68 F.3d 1180, 1188 (9th Cir. 1995); Sanjour v. E.P.A., 56 F.3d 85, 91-92 (D.C. Cir 1995). The fact that plaintiffs were singled out is alone insufficient evidence of discriminatory purpose. See Freeman, 68 F.3d at 1188, citing Bordenkircher v. Hayes, 434 U.S. 357, 364 (1978) and United States v. Kidder, 869 F.2d 1328, 1335 (9th Cir. 1989).

Here, the plaintiffs have tendered some evidence from which a reasonable jury could conclude that defendants intended to discriminate against plaintiffs based on the latter's exercise of their First Amendment rights. Plaintiffs argue that the City defendants acted improperly by informing plaintiffs that the City officers had a policy of accepting IFG's citizens' arrests for violation of the state trespassing statute, Penal Code § 602.[15] See

---

[15]Plaintiffs' argument that Penal Code § 602.8 expressly exempts First Amendment activities from criminal penalty for

Pls.' Opp'n to Mot. for Summ. J. at 22-25; Pls.' Mot. for Summ. J. at 22-25; Bolbol Decl. ¶ 26; Cuviello Decl. ¶ 20. As discussed *supra*, this policy appears to have related specifically to the exercise of speech activities at the areas around the Arena. See Cuviello Decl. Ex. A, Video clip 4-5; Bolbol Decl. ¶¶ 13, 26. This is more that mere evidence of having been treated differently, which courts have held insufficient, see Snowden v. Hughes, 321 U.S. 1, 7-8; Freeman, 68 F.3d at 1188, as it could reasonably be understood that defendants targeted plaintiffs because they were exercising their speech rights. Defendants' motion is therefore denied as to these causes of action. Because the evidence is not so conclusive to require a finding in plaintiffs' favor on this issue, plaintiffs' motion is also denied.

### 3.   City's Liability Under 42 U.S.C. § 1983

Municipal liability may be established in one of three ways. See Gillette v. Delmore, 979 F.2d 1342, 1346 (9th Cir. 1992). A plaintiff may prove that the actions in question were conducted pursuant to an official custom, policy, or practice; that the individual who committed the act was an official with final policymaking authority; or that such an official ratified a

---

trespassing holds no force. That exemption applies strictly to trespass on lands used for cultivation, which the plaintiffs have not shown to be relevant here. See Cal. Penal Code § 602.8(a); Quaterman v. Kefauver, 55 Cal. App. 4th 1366, 1372-73 (1997) (surveying similar language in many California statutes and concluding that § 602.8 applies to "agricultural land used for farming and growing crops, or at least rural land. . . ."). If the legislature desired this exemption to apply to all trespass, it certainly could have enacted a statute to this effect.

1  subordinate's unconstitutional act. Id.; accord Monell v. New York
2  Dep't of Soc. Serv., 436 U.S. 658, 691 (1978); Weiner v. San Diego
3  County, 210 F.3d 1025, 1028 (9th Cir. 2000). An agency may not be
4  liable on a *respondeat superior* theory, but only if there is
5  evidence that there is "an affirmative link between the policy and
6  the specific constitutional violation alleged." City of Oklahoma
7  v. Tuttle, 471 U.S. 808, 821 (1985).

8      The plaintiffs assert two theories under which the City is
9  liable for the rights violations that occurred on August 31,
10 2006.[16] First, they contend that the City's agents had decided that
11 the areas around the Arena would be treated as private property and
12 thus plaintiffs' speech activities could be circumscribed by IFG,
13 and enforced through citizens arrests that would be honored by the
14 City. Second, they contend that the City was deliberately
15 indifferent to plaintiffs' rights through its training of police
16 officers on the application of the trespassing statute. The court
17 considers each theory in turn.

18          **a.   Liability Through a Policy of Deferring to IFG's**
19              **Restrictions on Speech Activities**

20      For the purposes of municipal liability, a policy includes
21 "formal rules or understandings . . . that are intended to, and do,
22 establish fixed plans of action to be followed under similar

23 _____

24      [16]Plaintiffs also contend that the City is liable for the
   constitutional violations plaintiffs' suffered from the August 28,
25 2006 closure of West Washington Street. As the court explained,
   *supra*, this closure did not violate plaintiffs' rights under the
26 state or federal constitutions.

1  circumstances consistently and over time." <u>Pembaur v. City of</u>

2  <u>Cincinnati</u>, 475 U.S. 480, 480-81 (1986) (plurality). Liability only

3  attaches when the policy-maker "possesses final authority to

4  establish municipal policy with respect to the action ordered," so

5  that the act in question is plainly one of the municipal entity

6  rather than merely one of an employee of the entity. <u>Id.</u> at 482.

7  This policy-making authority is defined by legislative action or

8  by an delegation of authority from the person in whom the

9  legislature or similar body has vested such authority, to another.

10  <u>Id.</u> at 483. Finally, there will only be liability "where -- and

11  only where -- a deliberate choice to follow a course of action is

12  made from among various alternatives." <u>Id.</u>

13      Here, the plaintiffs assert that defendant Rishwain was a

14  policy-maker for <u>Monell</u> liability purposes and therefore his

15  decision that certain areas around the Arena would be treated as

16  private property and subject to IFG's control can be a basis for

17  the City's liability. <u>See</u> Pls.' Opp'n. to Defs.' Mot. for Summ. J.

18  at 29-30; Pls. Mot. for Summ. J. at 38-39. This decision was

19  conveyed to City officers, including Trulsson, who then reiterated

20  it to plaintiffs. Trulsson Decl. ¶ 12; Rishwain Decl. ¶ 17.

21  Further, an Operations Order was prepared for the Stockton Police

22  Department by Sergeant Ishii, which instructed officers that "Any

23  protestors must remain on public sidewalks or other public areas

24  without obstructing vehicle or pedestrian traffic" with the

25  exception of a "designated protest area" on Fremont Street.

26  Trulsson Decl. ¶ 17, Ex. A. Plaintiffs appear to argue that

1  Sergeant Ishii was a policy-maker and that the Operations Order
2  constituted a City policy. <u>See</u> Pls.' Mot. for Summ. J. at 39-40.
3      It is clear that in effect Rishwain's opinion defined the
4  conduct of City personnel.  Nevertheless, plaintiffs have failed
5  to tender any evidence that permit the court to conclude that
6  Assistant City Attorney Rishwain had final policy-making authority,
7  pursuant to a legislative or similar act, that would cause his
8  decision regarding the speech restrictions around the Arena to
9  constitute a "policy" for <u>Monell</u> liability.  Nonetheless, the City
10 established a legal department, to, among other things, consider
11 and advise its officers.  Nothing suggests that the City required
12 its legal officers to check with anyone about their advice.  Under
13 the circumstances, there is at least a question of fact as to
14 whether Rishwain was a policy maker for the City on subjects such
15 as those in issue.[17]
16     Similarly, plaintiffs have tendered no evidence regarding
17 Sergeant Ishii, who authored the Operations Order, and whether he
18 possessed the type of authority that would permit <u>Monell</u> liability
19 to attach based on his purported creation of City policy.  Once
20 again, however, the defendants have not tendered any evidence and
21 thus there continues to be an unresolved issue of fact.
22 ////

23

24     [17]Plaintiffs do not assert that the decision represented the
   custom or practice of the City, <u>see</u> Pls.' Opp'n to Defs.' Mot. for
25 Summ. J. at 28-30; Pls. Mot. for Summ. J. at 35-44, and therefore
   the court expresses no opinion about the viability of these
26 theories.

1                    **b.   Liability Through Failure to Train Officers As to**

2                         **the Application of the Trespassing Law**

3        Second, plaintiffs assert that the City is liable through its

4   failure to properly train officers on the relevant trespassing law,

5   which caused officers to erroneously believe they were required to

6   accept IFG's staff's citizens' arrests of persons it believed were

7   trespassing.

8        A municipality can be liable for failure to train its

9   employees in certain narrow circumstances. City of Canton, Ohio v.

10  Harris, 489 U.S. 378, 387 (1989). Inadequate training may serve as

11  a basis of § 1983 liability only when the failure to train

12  constitutes a deliberate indifference to the rights of those with

13  whom the officers come in contact. Id. at 388. Deliberate

14  indifference is shown where "in light of the duties assigned to

15  specific officers or employees, the need for more or different

16  training is so obvious, and the inadequacy so likely to result in

17  the violation of constitutional rights." Id. at 390. In resolving

18  the issue, the court must inquire into the training program itself,

19  as the fact that a particular officer acted improperly is not

20  sufficient evidence for the purposes of Monell liability. Id. at

21  390-91. "[P]lainly, adequately trained officers occasionally make

22  mistakes; the fact that they do says little about the training

23  program or the legal basis for holding the city liable." Id. at

24  391. Finally, the plaintiff must show a causal link between the

25  inadequate training program and the ultimate injury. Id.

26       Here, the plaintiffs rely solely on evidence that Lieutenant

1    Trulsson expressed to them on August 31, 2008 that if IFG staff

2    believed plaintiffs were trespassing, he would be required to

3    accept their citizens' arrest.[18] See Pls.' Opp'n to Defs. Mot. for

4    Summ. J. at 32-33; Trulsson Decl. ¶ 19. Even if this evinces

5    Lieutenant Trulsson's misunderstanding of the trespassing law as

6    it applied to plaintiffs, there is no evidence that this was caused

7    by an inadequate training program. In order to survive summary

8    judgment, the plaintiffs must tender some evidence about the City

9    of Stockton's training program and how it was deficient, and that

10   these deficiencies led to the injury suffered by plaintiffs. See

11   City of Canton, 489 U.S. at 390-91. On the other hand, the City has

12   provided no evidence of its training.  Thus, again, there is an

13   unresolved issue of fact.

14        **4.   Fifth Cause of Action**

15        In their fifth cause of action, plaintiffs allege defendants

16   violated California Civil Code section 52.1. The City defendants

17   move for summary judgment on the grounds that plaintiffs failed to

18   timely comply with the Government Claims Act; that there is no

19   evidence of threats, intimidation, or coercion; and that the

20   defendants are shielded by statutory immunities.

21        California Civil Code section 52.1(b) allows an individual to

22
_____

23        [18]Plaintiffs purport to offer deposition testimony of
     defendant Trulsson as evidence that he did not receive training on
24   the relationship between free speech rights and the crime of
     trespass. Pls.' Mot. for Summ. J. at 42-43; Pls' Reply in Support
25   of Mot. for Summ. J. at 18. The testimony cited does not address
     the issue of the training defendant Trulsson or other officers
26   received; additionally, certain excerpts cited by plaintiffs in
     their briefs have not been provided to the court.

bring a civil suit for damages, injunctive, or other equitable relief against anyone who has interfered with or attempted to interfere with his rights under federal or state statute or constitution. This interference includes "threats, intimidation, or coercion." Cal. Civ. Code § 52.1(a).

        **a.   Application of the California Government Claims Act**

The California Government Claims Act provides that "except as otherwise provided by statute, [a] public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person." Cal. Gov't. Code § 815. A city is a "public entity." Id. § 811.2. Prior to filing a suit for "money or damages" against a government entity, a written claim must be presented to the public entity's board. Id. § 945.4. A claim must be filed with the board even if the entity is immune from liability. Id. § 950.2. A plaintiff is excepted from section 945.4 if she pleads and proves that she neither knew nor had reason to know, within the time required for presenting her claim to the relevant state board, that her injury was caused by the public entity or by a public employee in the scope of his employment. Id. § 950.4. Otherwise, the failure to have filed a claim with the relevant government board is fatal to the plaintiff's cause of action. State v. Superior Court (Bodde), 32 Cal. 4th 1234, 1239 (2004).

Courts have held, however, that a plaintiff need not comply with the presentment requirement when seeking damages that are only incidental in purpose to injunctive or declaratory relief. See

Gatto v. County of Sonoma, 98 Cal. App. 4th 744, 760 (2002) (action for a large damage award and no injunctive and declaratory relief was required to comply with presentment requirement); Eureka Teacher's Assn. v. Bd. of Educ., 202 Cal. App. 3d 469, 474-75 (1988) (action for mandamus to which damages sought are incidental did not have to comply with presentment requirement); Harris v. State Pers. Bd., 170 Cal. App. 3d 639, 643 (1985), disapproved of on other grounds by Coleman v. Dept. of Pers. Admin., 53 Cal. 3d 1102 (1991) (same); Snipes v. City of Bakersfield, 145 Cal. App. 3d 861, 869-70 (1983), overruled on other grounds by State of Cal. v. Superior Court, 130 Cal. Rptr. 2d 94 (2003) (same); People v. City of Los Angeles, 160 Cal. App. 2d 494, 508 (1958) (action for abatement of nuisance was essentially equitable and incidental damages caused by the nuisance did not trigger the presentment requirement); Indep. Hous. Servs. of San Francisco v. Fillmore Center Assoc., 840 F. Supp. 1328 (N.D. Cal. 1993) (action for injunctive and declaratory relief, which also sought small amounts of damages, did not have to comply with presentment requirement).

A plaintiff may be required to comply with the presentment requirement if the damages sought are substantial in their amount. See Lozada v. City and County of San Francisco, 145 Cal. App. 4th 1139 (2006); see also Indep. Hous. Servs, 840 F. Supp. at 1358 (holding that plaintiffs did not have to comply with the presentment requirement when the damages sought were "small and . . . inconsequential"). In Lozada, the plaintiff sought damages for violations of § 1983, the Fair Employment and Housing Act, and the

Public Safety Officers Procedural Bill of Rights Act (POBRA). 145 Cal. App. 4th at 1146-47. Specifically, he sought damages for back pay, "general damages in an amount according to proof," a "civil penalty of $25,000" per violation, and punitive damages. Id. at 1148. The issue before the court was whether these damages were "money or damages" within the meaning of section 945.4, because the essential character of the POBRA was equitable. Id. at 1140. The court held that, even if the plaintiff's claims under POBRA had an equitable purpose, the damages he sought were not incidental to this. Id. at 1146. This was, first, because the civil penalty amounts were so large ($25,000 per violation). Id. at 1164. It was also due to the fact that the record did not show that the plaintiff "had any transcendent interest in injunctive or declaratory relief." Id. at 1169; see also Gatto, 98 Cal. App. 4th at 762-63 (action for $35,000 in damages where no injunctive or declaratory relief was sought, must comply with presentment requirement).

The instant case is a closer question. Here, the plaintiffs appear to primarily seek an injunction to ensure their ability to exercise their rights under the United States and California Constitutions, as well as declaratory relief that the defendants have violated their rights. The only compensatory damages specifically alleged are for emotional distress resultant from the defendants' violation of their rights. Compl. ¶ 84 They also seek punitive damages to deter further rights violations and civil penalties of $25,000 per violation of Civil Code 52. Compl. Prayer

1  for Relief.

2      The compensatory damages sought appear directly resultant from

3  the alleged violation, in the same manner as the damages held to

4  be incidental to the nuisance action in <u>People v. City of Los</u>

5  <u>Angeles</u> and to the action for ADA compliance in <u>Independent Housing</u>

6  <u>Services</u>. The punitive damages sought and civil penalties present

7  a more difficult question. On one hand, the penalties are for a

8  large amount, which weighs in favor of application of the

9  presentment requirement. <u>See</u> <u>Lozada</u>, 145 Cal. App. 4th at 1164;

10  <u>Gatto</u>, 98 Cal. App. 4th at 762-63; <u>Indep. Hous. Servs</u>, 840 F. Supp.

11  at 1358. On the other hand, the overwhelming objective of the

12  complaint appears to be injunctive and declaratory relief. This is

13  demonstrated by the fact that injunctive and declaratory relief is

14  listed first in the Prayer for Relief. <u>See</u> <u>Lozada</u>, 145 Cal. App.

15  4th at 1169 (using order of what is listed in the Prayer for Relief

16  as evidence of whether the suit is primarily for damages or not);

17  <u>Gatto</u>, 98 Cal. App. 4th at 762-63 (same). Plaintiffs expressly seek

18  exemplary damages for the purpose "to deter and to make an example

19  of those defendants." Compl. Prayer for Relief. All of this leads

20  the court to conclude that the damages and penalties sought are

21  incidental to the injunctive and declaratory relief. Accordingly,

22  the plaintiffs' action is not a "suit for money or damages" within

23  the meaning of the Government Claims Act, and thus plaintiffs were

24  not required to comply with the Act's presentment requirement.[19]

25

26      [19]In any event, it appears that plaintiffs complied with the
    presentment requirement. The parties do not dispute that the

40

**b.    Evidence of "Threats, Intimidation, or Coercion"**

California Civil Code section 52.1 prohibits an individual or entity from interfering or attempting to interfere with the rights of another through "threats, intimidation, or coercion." Cal. Civ. Code § 52.1(a). Defendants contend that there is no evidence of threats of physical violence towards plaintiffs, and therefore summary judgment must be granted in defendants' favor on this claim. The court disagrees.

Civil Code section 52.1 specifies that liability may not be based on "speech alone" unless "the speech itself threatens violence" and the person to whom it is directed reasonably believes that threat will be carried out. Cal. Civ. Code § 52.1(j).

---

plaintiffs presented their claim to the City of Stockton within one year of the injury for which they were complaining (the events surrounding the 2006 circus). The claim form apparently provided to the plaintiffs is entitled "Claim for Damages, City of Stockton," and at the top of the form states,

> Note: Claims for bodily injury or death, damage to personal property, or damage to growing crops must be filed on [this form] not later than six months after the occurrence out of which the claims arose. All other claims must be filed on this form not later than one year after the occurrence out of which the claims arose. (Refer to California Government Code sections 910.4 and 911.2.)

Declaration of Steven Hunt in Support of Defendants' Motion for Summary Judgment, Ex. A-B. Evidence has been tendered to the court that plaintiff Bolbol confirmed with a City of Stockton employee that, in accordance with this directive, plaintiffs' claims were required to be filed with the City within a year of their occurrence. Bolbol Decl. ¶¶ 33-35. Although the plaintiffs only raise this argument in their reply brief, it does appear that this causes defendants to now be estopped from asserting that the claims were not timely presented. See John R. v. Oakland Unified School Dist., 48 Cal.3d 438, 445 (1989) (public agency equitably estopped from asserting that the plaintiff has not complied with the presentment requirement, where the agency has prevented or deterred compliance through the acts of its agents).

1   Notwithstanding this, the particular coercive power of law
2   enforcement officers has led courts to impose liability when
3   detention, rather than violence, is threatened. In Cole v. Doe, 387
4   F. Supp. 2d 1084, 1102 (N.D. Cal. 2005), the court considered a
5   claim under section 52.1 based on police officers' actions, where
6   it was alleged that the officer stopped plaintiff, handcuffed him,
7   and detained him until he consented to a search of his vehicle. The
8   court held that this constituted "coercion" under section 52.1. Id.
9   The threat of detention or arrest is included in the plain meaning
10  of "coercion." Id. at 1103. The court relied in part on Whitworth
11  v. City of Sonoma, No. A103342, 2004 WL 2106606 (Cal. Ct. App.
12  Sept. 22, 2004), which had held that an officer acted coercively
13  under section 52.1 by physically barring plaintiff from entering
14  a meeting, without using or threatening to use force. The Cole
15  court also observed that the California statute is modeled on the
16  Massachusetts Civil Rights Act of 1979, and that Massachusetts
17  courts have interpreted its statute to define as coercion police
18  or security officers' threats of ejection or arrest. Cole, 387 F.
19  Supp. 2d at 1103-1104.

20       Here, there is evidence upon which a reasonable jury could
21  find that the officers' actions were coercive towards the
22  plaintiffs. Plaintiffs have tendered evidence that on August 31,
23  2006, Lieutenant Trulsson informed plaintiffs that if IFG
24  representatives believed plaintiffs to be trespassing on Arena
25  property and if they performed a citizens arrest of plaintiffs, the
26  Stockton Police would accept that arrest. Cuviello Decl. ¶¶ 21, 23,

25, 26. Plaintiff Bolbol also tendered evidence that, shortly afterwards, IFG staff threatened to place her under citizens arrest. Bolbol Decl. ¶ 28. She has tendered further evidence that on September 2, 2006, both a Stockton Police officer and IFG staff member threatened to arrest her while she was leafletting near the Arena. Id. ¶ 32. Out of fear of arrest, she left the Arena and did not return to leaflet the next day. Id. Cuviello has also declared that "[d]ue to the threat of arrest, and [his] fear of being arrested, [he] did not attempt to access Stockton Arena property during the following two days [he] was in Stockton to leaflet patrons and videotape the animals. Cuviello Decl. ¶ 29.

These facts suffice to permit a conclusion that City of Stockton Police officers, including defendant Trulsson, threatened the plaintiffs with detention so as to deter them from lawfully exercising their rights. This is all that is required to obtain relief under section 52.1. See Austin B. v. Escondido Union School Dist., 149 Cal. App. 4th 860, 883 (2007) ("The essence of a Bane Act claim is that the defendant, by the specified improper means (i.e., 'threats, intimidation or coercion'), tried to or did prevent the plaintiff from doing something he or she had the right to do under the law or to force the plaintiff to do something that he or she was not required to do under the law."). There seems no question that a reasonable person would be intimidated by threats of arrest and thus, in essence, deprived of their constitutional rights.

////

1                    **c.   Applicability of State Immunities**

2         Finally, defendants contend they are immune from liability on

3  plaintiffs' claim under section 52.1 because their acts were

4  discretionary. California Government Code section 820.2 provides

5  that public employees are not liable for any act or omission that

6  was the result of their exercise of discretion. Discretionary acts

7  are ones that "require the exercise of judgment and choice."

8  Burgdorf v. Funder, 246 Cal. App. 2d 443, 449 (1966). Clarifying

9  this, the California Supreme Court has defined discretionary

10  decisions are those that involve policy-making at a "quasi-

11  legislative" level, while ministerial decisions encompass those

12  that "merely implement a basic policy already formed."[20] Caldwell

13  v. Montoya, 10 Cal.4th 972, 981 (1995).

14         Here, the actions upon which plaintiffs' claims against the

15  City defendant rely are not all top level, policy-making decisions

16  that would give rise to immunity under § 820.2. Instead, plaintiffs

17  allege that the City defendants acted improperly in their

18  understanding of the access for speech activities to which

19  plaintiffs were entitled under the federal and state constitutions

20  and in their understanding of what the Penal Code requires with

21  regards to acceptance of citizens' arrests. In other words,

22  plaintiffs allege that the City defendants improperly implemented

23  the laws governing them. As such, the discretionary immunity of

24  ────────────

25         [20]California courts appear not to have borrowed the definition
   of "discretionary" in the qualified immunity context to define
26  discretionary acts under Government Code section 820.2.

44

1  Government Code section 820.2 is not implicated.

2       Accordingly, defendants Trulsson and Rishwain's motion for

3  summary judgment on plaintiffs' fifth cause of action is denied.

4            **d.    Liability of the City for Violations of Civil Code**

5                 **§ 52.1**

6       Defendants argue that the City cannot be liable for damages

7  under California Government Code section 815(a). The court

8  disagrees.

9       Government Code § 815 provides that "except as otherwise

10 provided by statute, [a] public entity is not liable for an injury,

11 whether such injury arises out of an act or omission of the public

12 entity or a public employee or any other person." The purpose of

13 the statute is to abolish common law liability against public

14 entities. Cal. Gov't Code § 815 Senate Committee Comment.

15 California courts have held that liability is "provided by statute"

16 when the California legislature has described a tort or other basis

17 of liability in a statute. Nestle v. City of Santa Monica, 6 Cal.

18 3d 920, 933 (1972); Levine v. City of Los Angeles, 68 Cal. App. 3d

19 481, 487-88 (1977). For example, in Nestle, the California Supreme

20 Court held that a city could be liable for nuisance because the

21 legislature had codified the tort of nuisance; this took nuisance

22 out of the realm of common law and therefore out of the purview of

23 Government Code § 815. Nestle, 6 Cal. 3d at 933. In other words,

24 a government entity may be liable under a statute even if that

25 statute does not expressly state that it applies to such entities.

26 Levine, 68 Cal. App. 3d at 487. The fact that the liability has

1  been codified suffices to meet section 815's requirements. Id.

2  Here, plaintiffs claims have been brought under Civil Code §

3  52.1, not common law. Although § 52.1 does not expressly state that

4  public entities may be liable under it, this omission does not

5  indicate that the City cannot be liable by virtue of Government

6  Code § 815. However, because plaintiffs' theory of the City's

7  liability appears premised on the liability of defendants Rishwain

8  and Trulsson and because plaintiff's liability is unresolved, the

9  court is unable to grant plaintiffs' motion on this cause of action

10  as to the City.

11  **5.   Sixth Cause of Action**

12  The City defendants move for summary judgment on plaintiffs'

13  sixth cause of action, which alleges that the defendants conspired

14  to deprive plaintiffs of their rights under the federal and state

15  constitutions, in violation of 42 U.S.C. § 1985.

16  To succeed on a § 1985 claim, the plaintiff must prove that

17  two or more persons conspired to deprive plaintiff of his rights,

18  based on a discriminatory, class-based animus. Griffin v.

19  Breckenridge, 403 U.S. 88 (1971). "Class-based animus" includes

20  discrimination based on race, id. at 102, or another protected

21  class, such as gender. See Nat'l Abortions Fed. v. Operation

22  Rescue, 8 F.3d 680, 682 (9th Cir. 1993); Life Ins. Co. of N.

23  America v. Reichardt, 591 F.2d 499, 505 (9th Cir. 1979). The court

24  is aware of no authority, nor do plaintiffs direct it to any, that

25  would allow "persons attempting to exercise a protected right" to

26  be considered a "class" for § 1985 purposes; indeed, this seems an

46

unlikely interpretation, as violation of a protected right is a distinct element of the cause of action. See Life Ins. Co. of N. America, 591 F.2d at 503.

Plaintiffs have presented minimal evidence of a meeting of the minds among the defendants, relying largely on evidence that meetings occurred prior to the circus during which employees of IFG, Ringling Bros. and the City discussed various aspects of planning for the event. See Bulzomi Decl. ¶¶ 9-10; Declaration of Joseph Cuviello In Support of Pls.' Notice of Errata (Doc. No. 149) Ex. D at 56:12-59:19, 62:1-8, 87:22-88:22; Id. Ex. B at 99:6-25. Even if this sufficed to permit a jury to infer that a conspiracy existed, there is no evidence that the City defendants acted with class-based animus, as described supra. This is fatal to the claim. Griffin, 403 U.S. at 102; Bretz v. Kelman, 773 F.2d 1026, 1028 (9th Cir. 1985). Plaintiffs have not opposed defendants' motion as to this cause of action. Defendants' motion is therefore granted and plaintiffs' is denied.

**B.   Plaintiffs' Motion for Summary Judgment Against IFG**

Plaintiffs move for summary judgment against defendant IFG on all causes of action. The first, third, and sixth causes of action derive from 42 U.S.C. § 1983 and the court, like the plaintiffs, first turns to whether IFG is a state actor so that it could be held liable on any of these causes of action.[21] Plaintiffs also

---

[21]Oddly, plaintiffs have pled their second and fourth causes of action, which allege violations of the California constitution, under 42 U.S.C. § 1983, which is inappropriate. See 42 U.S.C. § 1983 ("Every person who, under the color of statute, ordinance,

1    move for summary judgment against IFG on their fifth cause of
2    action for violation of California Civil Code § 52.1, which the
3    court considers separately.

         1.    **Whether IFG Is A State Actor**

5         A private entity can be liable under 42 U.S.C. § 1983 in
6    certain narrow circumstances. When alleged to have committed a
7    Constitutional tort, the analysis of private entity liability
8    proceeds in two parts. Lugar v. Edmondson Oil Co., 457 U.S. 922,
9    939 (1982); Villegas v. Gilroy Garlic Festival Ass'n, 541 F.3d 950,
10   954-55 (2008) (en banc). First, the court considers whether the
11   plaintiffs' "claimed deprivation has resulted from the exercise of
12   a right or privilege having its source in state authority." Lugar,
13   457 U.S. at 939. If so, the court proceeds to the second inquiry,
14   which is whether the private entity "may be appropriately
15   characterized as 'state actors.'" Id. This inquiry is informed by
16   several considerations, with the ultimate question being whether
17   there has been shown to be a sufficiently close nexus between the
18   private entity's action and the state. Brentwood Academy v.
19   Tennessee Secondary Sch. Athletic Ass'n., 531 U.S. 288, 295 (2001);

20

21   regulation, custom, or usage, of any State . . . subjects or causes
     to be subjected, any citizen of the United States . . . to the
22   deprivation of any rights . . . secured by the Constitution . . .
     shall be liable to the party injured. . . .") . In their motion for
23   summary judgment, plaintiffs do not appear to seek summary judgment
     on those causes of action against IFG based on the California
24   constitution. See Pls.' Mot. for Summ. J. at 19-28 (referring only
     to the City defendants' actions with regards to the second and
25   fourth causes of action), 33-35 (arguing that IFG is a state actor
     for § 1983 purposes), 44-47 (arguing that IFG is liable on the
26   sixth cause of action, based on state statute).

                                    48

1   see also Nat'l Collegiate Athletic Ass'n v. Tarkanian, 488 U.S.

2   179, 192 (1988) (where the state "provided the mantle of authority

3   that enhanced the power of" the private actor, the private actor

4   may be liable under § 1983). The Ninth Circuit, like the Supreme

5   Court, has recently rejected the conception of distinct tests[22] to

6   determine whether a private entity's action should be considered

7   state action. Villegas, 541 F.3d at 955-57 & n. 4; see also

8   Brentwood Academy, 531 U.S. at 295-96. Instead, the court should

9   consider the facts of the case before it, paying special attention

10  to whether "(1) the organization is mostly comprised of state

11  institutions; (2) state officials dominate decision making of the

12  organization; (3) the organization's funds are largely generated

13  by the state institutions; and (4) the organization is acting in

14  lieu of a traditional state actor." Villegas, 541 F.3d at 955.

15       Here, there appears no dispute that the first step of the test

16  is satisfied, in that the rights that plaintiffs allege were

17  infringed were federal Constitutional rights. The court now turns

18  to the more complex question of whether there was such a close

19  nexus between IFG's conduct and the City of Stockton so as to

20  render IFG's acts the acts of the state for § 1983 purposes.

21       As stated above, whether a private entity should be considered

22  a state actor under § 1983 is a multi-part inquiry that requires

23  examination of the unique facts of the particular case. Similar

24

25       [22]These have included the "public function" test, "joint
    action" test, "governmental compulsion or coercion" test and
26  "governmental nexus" test. See Kirtley v. Rainey, 326 F.3d 1088,
    1092 (9th Cir. 2003).

cases, however, have provided the court some guidance here. In Villegas, the Ninth Circuit considered whether a private corporation was a state actor under § 1983, where there was a close relationship between the corporation's security group and the City of Gilroy. There, plaintiffs were members of a motorcycle club who were asked to leave the Gilroy Garlic Festival for refusing to remove vests marked with images and words referencing their club. Villegas, 541 F.3d at 952-53. The Garlic Festival was run by a private corporation in a public park, which it essentially had rented from the City of Gilroy. Id. at 953. The corporation used its own security force, one of the heads of which is typically a Gilroy police officer. Id. The corporation reimbursed the City for the officers' time. Id. When the plaintiffs were told to remove their vests or leave the festival premises, this was done by both a security officer (who was an off-duty police officer) and a uniformed Gilroy police officer. Id. at 954. At the time of this incident, the head of the festival's security was using the Gilroy Police Department's command post on the festival grounds. Id. at 955. Moreover, the event was held on public land with the permission of the City. Id. at 955. The City provided supplemental services to the event, including security assistance. Id.

Considering all of this, the Ninth Circuit nevertheless held that the private corporation was not acting as a state actor for § 1983 purposes. Id. at 957. Despite all the above, the court argued that a recreational event such as a festival is not a traditionally state function. Id. at 955-56. Finally, it declared

1 the City did not play a "dominant role in controlling the actions
2 of the organization or the contents of the festival." Id. at 956.
3 Accordingly, the court held that the corporation running the
4 festival could not be liable under § 1983. The conclusion reached
5 in Villegas hardly seems inevitable and indeed might be viewed as
6 contrary to an earlier Circuit result.

7     In Lee v. Katz, 276 F.3d 550 (2002), a private company had
8 leased an outdoor area adjacent to a city-owned arena, coliseum,
9 and other public buildings in Portland. Id. at 551. In its
10 administration of the area, the company restricted where and how
11 speech could occur in the area, specifically by creating a few
12 "Free Speech Zones" within the area. Id. at 552. The company
13 enforced these policies with private security officers, although
14 it had also provided the policies to the city's district attorney
15 and police officers, albeit not for the purpose of soliciting
16 comment. Id. at 553.

17     The court held that "in regulating speech within the [outdoor
18 area] the [company] performs an exclusively and traditionally
19 public function within a public forum," and therefore should be
20 treated as a state actor under § 1983. Id. at 554. It concluded
21 that the outdoor area was quintessentially public, because it
22 "functions as a freely accessible public forum through which people
23 pass on their way to shows, concerts, games, and restaurants" and
24 as "a gathering place for public events," including a recent
25 massive public vigil. Id. at 555. By regulating speech in the area
26 to the exclusion of the city, the Circuit held the company was

performing a traditional state function so as to expose it to §
1983 liability. Id. at 556. The Villegas court has since emphasized
that Lee's holding stands for the proposition that a private party
is a state actor when it performs a function that is "both
traditionally and *exclusively* governmental." Villegas, 541 F.3d at
956 n. 2 (emphasis in original).

Distinguishing between Villegas and Lee is difficult. In both
cases, the location was "public" for First Amendment purposes. See
Villegas, 541 F.3d at 953 (event held at a public park); Lee, 276
F.3d at 557. Both cases involved a private entity policing
speech.[23] Villegas, 541 F.3d at 957; Lee, 276 F.3d at 554. In both
cases, plaintiffs were attempting to exercise their speech rights
at some type of event (the Garlic Festival in Villegas and outside
of concerts held at the city's arena and coliseum in Lee).
Villegas, 541 F.3d at 953; Lee v. Katz, No. CV00310PA, 2004 WL
1211921 (D. Or. June 2, 2004). In both, the city had ceded control,
at least to a degree, of the area to a private company. Villegas,
541 F.3d at 953; Lee, 276 F.3d at 552. Although in Villegas the
company had obtained a permit to operate a festival and in Lee, the
company had leased the area, the leasehold itself was not
dispositive, as the Lee court expressly cautioned that it did "not
hold that everyone who leases or obtains a permit to use a state-
owned public forum will necessarily become a State actor." Lee, 276

---

[23]The court notes, for clarity's sake, that the district court
in Villegas held that plaintiffs' dress did not implicate their
First Amendment rights, a holding which the Court of Appeals did
not disturb. See Villegas, 541 F.3d at 950.

1   F.3d at 556.

2       What may be dispositive in distinguishing the cases is the

3   degree of control exercised by the private company over speech. In

4   Lee, the court emphasized that the private company regulated all

5   speech at all times in the public area, including when the public

6   was freely coming and going through the area. Id. at 555-56. It

7   performed this function at the exclusion of the city. Id. at 556.

8   In Villegas, in contrast, the court emphasized that the role of the

9   private company was to run a festival and its regulation of speech

10  occurred in the context. Villegas, 541 F.3d at 955-56. Because

11  festivals were not quintessential state functions and because the

12  city was not excessively involved in the management of the

13  festival, the company was said not to have assumed the role of a

14  state actor. Id. at 956.

15      Here, IFG's role seems to lie somewhere between the private

16  companies at issue in Villegas and Lee, though the court concludes

17  IFG tends not to resemble a state actor here. The evidence tendered

18  to the court shows that IFG and the City of Stockton had a

19  contractual relationship whereby IFG managed certain city

20  facilities, including the Stockton Arena.[24] Declaration of Jonathan

21  Rizzardi in Support of IFG's Opposition to Plaintiffs' Motion for

22  Summary Judgment ("Rizzardi Decl.") Ex. E (Facilities Management

23  Agreement) at 40. IFG refers to this as a lease. IFG's Opp'n to

24  

25      [24]Neither IFG nor the plaintiffs have provided the court with
    a complete copy of the Facilities Management Agreement, which
26  impairs the thoroughness of the court's analysis here.

1  Pls.' Mot. for Summ. J. at 10. The evidence tendered reveals that
2  IFG's duties included staffing the arena, booking events, and
3  marketing. Leigh Decl. Ex. G (Facilities Management Agreement) at
4  26. The Agreement also required IFG to create policies and
5  procedures for "crowd management" and to provide security at the
6  Arena. Id. at 28, 34. Prior to events at the Arena, representatives
7  from IFG were required to meet with representatives from the City
8  of Stockton to develop a security plan for the event. Id. at 34.

9       Although IFG maintains an ongoing lease over the Arena,
10 comparable to that in Lee, IFG appears not to have usurped a
11 traditional state function, as the Lee court concluded the
12 defendant had there. As in Villegas, IFG's regulation over conduct
13 occurring at the Stockton Arena appears primarily focused on the
14 provision of security. See Leigh Decl. Ex. G at 26, 28; Villegas,
15 541 F.3d at 955. IFG has not, to this court's knowledge, set
16 policies either expressly or tacitly limiting speech at the areas
17 it manages. This stands in contrast to the private company in Lee,
18 which created a policy of establishing "free speech zones" in the
19 public areas it managed. Lee, 276 F.3d at 552. Moreover, IFG's
20 security policies are not created to the exclusion of the City; on
21 the contrary, the Facilities Management Agreement requires that IFG
22 develop these policies jointly with the City. Leigh Decl. Ex. G at
23 34. This too distinguishes the instant case from one of the
24 dispositive elements of Lee. Lee, 276 F.3d at 552-53.

25      Furthermore, Villegas counsels that a close relationship
26 between the City's police department and the security of the

1   private company does not render the company a state actor. Here,

2   as in Villegas, there is no evidence that IFG "is mostly comprised

3   of state institutions," that city officials "dominate decision

4   making of" IFG or that IFG's "funds are largely generated by the

5   [City] institutions." Villegas, 541 F.3d at 955. That the City

6   retains certain authority over IFG's management, including final

7   approval over the budget and IFG's entry into contracts, does not

8   appear to be sufficient to create the close nexus required to

9   render IFG effectively an agent of the City. See Evans v. Newton,

10  382 U.S. 296, 299 (1966) ("where a tradition of municipal control

11  [over a private park] had become firmly established," the park's

12  trustees were state actors per § 1983).

13       Accordingly, the court concludes that IFG is not a state actor

14  for the purposes of assigning liability under § 1983. Plaintiffs'

15  motion is denied in this regard.

16       **2.   IFG's Liability Under California Civil Code § 52.1**

17       As described *supra*, a private party may be liable under Civil

18  Code § 52.1 for interfering or attempting to interfere with a

19  person's rights by threats, intimidation, or coercion. Plaintiffs

20  argue that IFG violated this statute on August 31 and September 2,

21  2006 by preventing plaintiffs from accessing the Stockton Arena in

22  order to exercise their free speech rights.

23       As hitherto explained, threats of detention or arrest

24  constitute "coercion" under § 52.1. Plaintiffs have tendered

25  evidence that on August 31, 2006, IFG's Director of Events told

26  plaintiff Bolbol that she could not remain on the Arena's back

1  parking lot to leaflet patrons and that if she did not have a
2  ticket and refused to leave Arena property, he would place her
3  under citizens arrest. Bolbol Decl. ¶ 28. This occurred not long
4  after plaintiffs had been informed by defendant Trulsson that the
5  City of Stockton police officers would honor a citizens' arrest by
6  IFG staff. Bolbol Decl. ¶ 26; Cuviello Decl. ¶ 20. A jury could
7  reasonably find that this lent a particular coercive force to IFG's
8  staff's statements. Cf. Cole, 387 F. Supp. 2d at 1103-1104.

9      There is similar evidence from which a jury could conclude
10  that IFG staff coerced plaintiff Bolbol from not exercising her
11  First Amendment rights on September 2, 2006. Plaintiffs have
12  tendered evidence that on that date, Bolbol attempted to enter
13  Arena property to leaflet patrons, but was stopped by an IFG
14  representative. Bolbol Decl. ¶ 29. City of Stockton Police Sergeant
15  Goodnight then arrived. Id. According to plaintiff, "without being
16  prompted by the IFG representative, [Sergeant Goodnight] asked
17  security if they wanted to arrest" Bolbol. Id. ¶ 32. Another IFG
18  representative told Bolbol that she would be arrested if she
19  remained on Arena property, and Bolbol left the property. Id.
20  Again, this course of events could lead a reasonable jury to
21  conclude that IFG's coerced Bolbol with the threat of arrest, which
22  held particular force given the City police officer's apparent
23  support of IFG's threat.

24      While there may be a metaphysical issue as to whether
25  plaintiffs felt coerced and intimidated, there is no realistic
26  issue.  Accordingly, summary judgment is granted on plaintiffs'

cause of action.  The question of the amount of damages appears appropriate for trial.

**C.   Order to Show Cause**

On September 16, 2008, the court granted plaintiffs a preliminary injunction against the City defendants and IFG to ensure plaintiffs' rights would not be violated at the 2008 Ringling Bros. circus at the Stockton Arena. The injunction provided as follows:

1.   From September 18 through 21, 2008, plaintiffs shall be permitted full access to the public fora surrounding the Stockton Arena, including parking lots and public walkways, without interference from International Facilities Group or its agents or the City of Stockton or its agents.

2.   From September 18 through 21, 2008, plaintiffs shall be permitted full access to the public streets, including W. Washington Street, of the City of Stockton, without interference from International Facilities Group or its agents or the City of Stockton or its agents.

3.   From September 18 through 21, 2008, plaintiffs shall be permitted to distribute leaflets and videotape in any public streets and any public fora areas surrounding the Stockton Arena.

Plaintiffs now contend that the defendants violated the terms of the injunction.

The court received evidence on this in the form of live testimony and documentary evidence. As the court expressed in its ruling following the hearing, the only evidence of IFG's violation of the injunction was the acts of its agent, Mr. Zenon. Mr. Zenon did not significantly interfere with plaintiffs' rights and so IFG is not held in contempt of the preliminary injunction.

The City of Stockton did violate the injunction. The parties

57

1  presented evidence of three separate incidents at which City
2  officers interfered with plaintiffs' First Amendment rights. These
3  included two incidents on September 18, 2008 and one incident on
4  September 20, 2008. Although the incidents were brief and concluded
5  with the officers, each time, permitting plaintiffs' to resume
6  their First Amendment activities, the court cannot overlook the
7  disruptive character of the officers' conduct. The City of Stockton
8  had a duty to take "all reasonable steps within [its] power to
9  ensure compliance with the [court's] order." Suffler v. Heritage
10 Bank, 720 F.2d 1141 (9th Cir. 1983), citing Sekaquaptewa v.
11 MacDonald, 544 F.2d 396, 406 (9th Cir.1976), cert. denied, 430 U.S.
12 931, 97 S.Ct. 1550, 51 L.Ed.2d 774 (1977); see also Stone v. City
13 and County of San Francisco, 968 F.2d 850 (9th Cir. 19920 ("This
14 Circuit's rule with regard to contempt has long been whether the
15 defendants have performed all reasonable steps within their power
16 to ensure compliance with the court's orders."). Here, it failed
17 to do so. Although Captain Paoletti appeared to act in a manner
18 consistent with his duty, he delegated this responsibility to
19 Sergeant Christianson, who failed himself to understand the
20 requirements of the preliminary injunction and adhere to them, as
21 well as to ensure that the officers subordinate to him understood
22 and complied with it. Accordingly, the court holds the City of
23 Stockton in contempt and orders that it pay each plaintiff one
24 hundred dollars each.  The court further concludes that plaintiffs
25 are prevailing parties and accordingly are entitled to attorneys'
26 fees.

## IV. CONCLUSION

For the reasons stated herein, the court orders as follows:

1.  Defendants' motion for summary judgment (Doc. No. 78) is GRANTED IN PART AND DENIED IN PART, as stated herein.

2.  Plaintiffs' motion for summary judgment (Doc. No. 116) is GRANTED IN PART AND DENIED IN PART, as stated herein.

3.  The City of Stockton is HELD in contempt of the court's September 16, 2008 Preliminary Injunction. The City is ORDERED to pay one hundred dollars to each of the plaintiffs within fifteen (15) days of the date of this order. The City is also ORDERED to reimburse plaintiffs for the fees and costs associated with their bringing the Motion for an Order to Show Cause. Plaintiffs SHALL file and serve not later than fifteen (15) days from the date of this order a statement of the fees and costs expended in filing that motion, with supporting evidence. Defendant City of Stockton may file objections, if any, not later than ten (10) days from the date of plaintiffs' filing.

IT IS SO ORDERED.

DATED:  January 23, 2009.

LAWRENCE K. KARLTON
SENIOR JUDGE
UNITED STATES DISTRICT COURT